William **FITZGERALD**

v.

**MOUNTAIN LAUREL RACING, INC.,
Kenneth Marshall and John Knight,
Presiding Judge, Appellants.**

No. 78–2460.

United States Court of Appeals,
Third Circuit.

Argued June 7, 1979.

Decided Sept. 26, 1979.

As Amended Nov. 26, 1979.

Sanford S. Finder (argued), Washington, Pa., for appellee.

Dale Hershey (argued), Stuart A. Williams, Eckert, Seamans, Cherin & Mellott, Pittsburgh, Pa., for appellants.

Before ADAMS and ROSENN, Circuit Judges, and LACEY, District Judge.*

## OPINION OF THE COURT

ROSENN, Circuit Judge.

We are required in this appeal to plunge once again into the murky waters of the state action doctrine underlying a civil rights action brought under 42 U.S.C. § 1983.[1] Specifically, we are asked to determine whether the act of a heavily state regulated private harness racing association in expelling a licensed trainer and driver from its track without a hearing, on the ground that the driver has violated a state harness racing commission rule, is state action for purposes of a section 1983 suit.

---

\* Honorable Frederick B. Lacey, United States District Judge for the District of New Jersey, sitting by designation.

1. 42 U.S.C. § 1983 provides: "Every person who, under color of any . . . regulation . . . of any State . . . , subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

The district court concluded that state action was present and granted a preliminary injunction enjoining the association from denying the driver access to its racetrack. *Fitzgerald v. Mountain Laurel Racing, Inc.,* 464 F.Supp. 263 (W.D.Pa. 1979). We agree and affirm the order of the district court granting the preliminary injunction.

## I.

Appellant Mountain Laurel Racing Inc., ("Mountain Laurel") is a private Pennsylvania corporation operated for a profit and licensed by the Pennsylvania State Harness Racing Commission ("Racing Commission") to conduct harness racing in the Commonwealth. Mountain Laurel, in order to conduct harness races, leases The Meadows Race Track, a privately owned facility near Washington, Pennsylvania.

Harness racing, as it is in most states, is a stringently regulated business in Pennsylvania. A private racing association engaged in pari-mutuel wagering, like Mountain Laurel, must be licensed by the State before it may conduct harness races. The officers, and even the stockholders of a private racing association are subject to Commission approval. The State derives substantial tax revenues from harness racing, collecting a percentage of the track's wagering income.[2]

Further, all of the individuals directly engaged in harness racing are state licensed. Drivers, trainers, grooms and owners of horses must be licensed by the Racing Commission before they may pursue harness racing. Racing associations like Mountain Laurel privately employ officials licensed by the State to enforce Racing Commission Rules at the private racetracks. Most notably, the racing associations defray the salaries of racing judges who oversee the conduct of the races and a racing secretary who performs certain administrative duties, specifically fixed by the Racing Commission, including the establishing of standards for horses.[3] Pennsylvania State Harness Racing Commission, Rules and Regulations, Rule 6, § 23 (1977). The presiding judge is charged by the Racing Commission with the task of enforcing the rules and regulations of the Commission, supervising all other licensed race officials, and with rendering daily records to the Commission of the activities and conduct of the race meetings. *Id.,* Rule 6, § 10.

Appellee William Fitzgerald is a licensed harness racing trainer and driver. At the beginning of the 1978 racing season, Fitzgerald had nine horses under his care to train and drive at the Meadows. Mountain Laurel has a policy by which it privately contracts to provide free stall space at the track to trainers and drivers as long as the horses are run in races and are managed according to the terms of the contract. This "stall agreement" must be first approved by the Racing Commission before it may be used by a racing association. The key provision in the stall agreement is a clause by which Mountain Laurel reserves the unrestricted right to revoke the agreement upon giving the owner or trainer a 72 hour notice to vacate the premises.[4] The

2. We were informed at oral argument that the State also participates financially by providing funds for the track's "breakage," *i. e.,* the State and the private track split the difference between the computer set odds and the actual mathematical pay-off to the bettors. The State also provides funds for the Pennsylvania Sire Stakes races conducted at various racetracks.

3. Although the private racing association pays the salaries of the racing judges, they are not employees of the association in an ordinary sense because they apparently perform duties only for the State Harness Racing Commission. The racing secretary, however, appears to perform some functions for both the Racing Commission and the private track.

4. The stall agreement provides in relevant part:
¶ 7 [Mountain Laurel] reserves the unrestricted right to deny any stall space, to revoke this permit, and/or to have any owner or trainer using any stall space or any other facilities at the Meadows vacate the same and to remove all horses, equipment and/or personnel from the premises of the Meadows, or from one assigned barn to another, at any time and for any reason, at the discretion of [Mountain Laurel], within 72 hours after receiving notice to vacate from [Mountain Laurel]. . . .

stall agreement also contains clauses reserving Mountain Laurel's rights to reject entry or eject from the Meadows individuals considered undesirable by it.[5]

Fitzgerald and Mountain Laurel entered into a stall agreement for the 1978 racing season. In March of 1978, Fitzgerald was suspended by the racing judges for "inconsistent driving," an offense under Rule 18, § 5 of the Racing Commission Rules & Regulations.[6] The gist of the offense is that the driver is not giving the best performance possible, which detracts from the quality of the race.

In August of 1978, Mountain Laurel suspected Fitzgerald of again engaging in inconsistent driving. On August 19, 1978, Mountain Laurel's management met with the racing secretary and the presiding racing judge. The racing officials confirmed management's impression that Fitzgerald was indeed engaging in inconsistent driving. Mountain Laurel decided to exercise its 72-hour option to vacate in the stall agreement and notified Fitzgerald to remove his horses from the track. The decision to exercise the option was conveyed to Fitzgerald later in the day in the presence of the racing judges by Kenneth Marshall, the racing secretary.

Fitzgerald instituted a lawsuit under 42 U.S.C. § 1983 on August 24, 1978, against Mountain Laurel, Kenneth Marshall, the track racing secretary, and John Knight, the track presiding judge, alleging that the defendants had denied him due process of law in violation of the fourteenth amendment. Fitzgerald sought immediate as well as permanent injunctive relief to restrain the defendants from denying him access to the Meadows. The court treated the complaint as a request for a temporary restraining order under Fed.R.Civ.P. 65(b) and a preliminary injunction under Fed.R. Civ.P. 65(a). The court denied issuance of a temporary restraining order on August 24, 1978. On August 28, 1978, a hearing was held on the motion for a preliminary injunction at which time Mountain Laurel moved to dismiss the complaint on the ground, *inter alia,* that the state action prerequisite to the maintenance of a section 1983 action was lacking.

Mountain Laurel contended that its decision to exercise the 72-hour order to vacate in the stall agreement was a purely private act devoid of state involvement. The district judge disagreed, finding a sufficient connection between the State's involvement in harness racing and the challenged conduct to warrant a finding of state action under *Jackson v. Metropolitan Edison Company,* 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974). The district court granted Fitzgerald's motion for a preliminary injunction on August 31, 1978, enjoining Mountain Laurel from denying Fitzgerald "the right to stall horses, drive horses, train horses, and make other use of the facilities." Mountain Laurel thereafter filed a motion to invoke disciplinary procedures under the Rules and Regulations of the Racing Commission, proposing to afford Fitzgerald a hearing thereunder. The district court denied this motion on September 7, 1978. Mountain Laurel appeals from both the issuance of the preliminary injunction and the denial of its motion to invoke Racing Commission procedures.[7]

---

5. The stall agreement provides:

¶ 21 [Mountain Laurel] reserves the right to reject any entry.

¶ 22 [Mountain Laurel] may refuse admittance or to eject from the Meadows anyone considered undesirable by it.

6. Pennsylvania State Harness Racing Commission, Rules and Regulations (1977), Rule 18, § 5 *Fraudulent or Unsatisfactory Driving:*

(c) In the event
(1) A drive is unsatisfactory due to carelessness or indifference, or

(2) is being raced in an inconsistent manner compared to an established pattern of prior performances, and the judges believe that there is no fraud, they may forthwith impose a penalty.

7. This Court has jurisdiction over the appeal from the order granting the preliminary injunction by virtue of 28 U.S.C. § 1292(a)(1). Jurisdiction over the denial of the motion to invoke Racing Commission procedures is proper under 28 U.S.C. § 1292(a)(1) because the motion sought modification of the preliminary injunction.

## II.

At the outset, we are presented with the possibility that this controversy is now moot. Fitzgerald did return to the Meadows after the grant of the injunction and he continued to train and race horses there until the close of the racing season in November 1978. At that time, Fitzgerald voluntarily left the track and there is no indication that he has returned.

We believe that the dispute between the parties is still alive. The preliminary injunction issued by the district court was not limited to the duration of the 1978 season. Under the protective aegis of the injunction, Fitzgerald could return to the Meadows at any time and demand that Mountain Laurel permit him to train and race horses there. It is an accepted legal principle that a controversy is not moot when it is "capable of repetition, yet evading review." *Southern Pacific Terminal Co. v. ICC,* 219 U.S. 498, 514–15, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911); *Moreland v. W. P. I. A. L.,* 572 F.2d 121, 123 n.1 (3d Cir. 1978). In the present case, were we to dismiss this appeal as moot and should Fitzgerald return to the Meadows to train and race horses, the controversy would be revived and Mountain Laurel would have to seek review *de novo.* We believe, therefore, that this case fits the "capable of repetition, yet evading review" exception to the mootness doctrine. Accordingly, we proceed to the merits of this appeal.

## III.

The core of this lawsuit is whether or not Mountain Laurel's eviction of Fitzgerald from the Meadows constituted state action sufficient to establish a jurisdictional basis for a section 1983 suit. The answer to this question turns on the precise nature of the State's relationship to Mountain Laurel in the factual context of this case.

Our starting point for an analysis of state action is *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961). There, the Court found state action present in a racial discrimination case brought against a privately owned restaurant operated in a publicly owned and state subsidized parking garage. The test announced in *Burton* was simply that when the State has not clearly directed the private act of discrimination but where the private enterprise has a "symbiotic" relationship with the State, state action is present. The Court held:

> The State has so far insinuated itself into a position of interdependence with [the restaurant] that it must be recognized as a joint participant in the challenged activity, which, on that account, cannot be considered to have been so "purely private" as to fall without the scope of the Fourteenth Amendment.

*Id.* at 725, 81 S.Ct. at 862. The Court, however, cautioned that "[o]nly by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance." *Id.* at 722, 81 S.Ct. at 860.

The limits of the *Burton* symbiotic relationship test were subsequently explored in *Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972), in which the Court found no state action present in racial discrimination by a private club regulated by the Pennsylvania Liquor Control Board. The Court noted that the symbiotic relationship between state and private enterprise found in *Burton* was lacking in this case inasmuch as the Moose Lodge was a private social club operating in a private building. *Id.* at 175, 92 S.Ct. 1965. Despite the pervasive nature of the regulations of private clubs by the State Liquor Control Board, the Court held that "[h]owever detailed this type of regulation may be in some particulars, it cannot be said to in any way foster or encourage racial discrimination. Nor can it be said to make the State in any realistic sense a partner or even a joint venturer in the club's enterprise." *Id.* at 176–77, 92 S.Ct. at 1973. The *Moose Lodge* case therefore stands for the basic principle that heavy state regulation of a private entity does not necessarily give rise to a *Burton* symbiotic relationship so as to warrant a finding of state action "within the ambit of the Equal Protection Clause of

the Fourteenth Amendment." *Id.* at 177, 92 S.Ct. at 1973.

The Supreme Court, however, continued to explore the relationship between extensively state regulated private enterprises and the commission of allegedly unconstitutional acts by them in *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 447 (1974). That case involved a heavily regulated but privately owned utility company, which discontinued service to a customer without a hearing after she failed to pay her utility bills. The termination of service without a hearing did *not* constitute state action in violation of the fourteenth amendment. The Court held that "the inquiry must be whether there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself." *Id.* at 351, 95 S.Ct. at 453. The Court further held that:

> Approval by a state utility commission of such a [termination] request from a regulated utility, where the commission has not put its own weight on the side of the proposed practice by ordering it, does not transmute a practice initiated by the utility and approved by the commission into "state action."

*Id.* at 357, 95 S.Ct. at 456. The "close nexus" test of *Jackson* posits that the State must be intimately involved in the challenged private conduct before that conduct becomes attributable to the State for purposes of a section 1983 action alleging a violation of the Due Process Clause of the fourteenth amendment.

There was some question after *Jackson* whether the "close nexus" test of that decision totally superseded the "symbiotic relationship" test of *Burton.* This Circuit concluded that *Burton* is still viable.[8] Judge Adams in *Braden v. University of Pittsburgh (Braden II),* 552 F.2d 948, 958 (1977) (footnote omitted) explained:

It may be that only in the absence of an inextricably-linked relationship between the state and a private entity does the "close nexus" test of *Jackson* come into play. Where a private enterprise stands, in its operations, as a veritable partner with the state, then it seems proper to hold such enterprise subject to the same constitutional requirements to which the state is accountable. But the situation may be otherwise where no pervasive state-private relationship exists. For without such an arrangement, there would be no basis for holding a private entity to constitutional strictures, unless the state is closely involved in the very activity challenged by a litigant.

Thus, it is possible that a symbiotic relationship between state and private enterprise could give rise to state action, or in the absence of such a relationship, state action still might be found if "the state is closely involved in the very activity challenged." *Id.*

### IV.

The key facts of this case involve the narrow circumstances under which Mountain Laurel exercised its right to expel Fitzgerald under the terms of the stall agreement. The impetus for Fitzgerald's expulsion came from Mountain Laurel's renewed suspicion that Fitzgerald was engaging in "inconsistent driving," a violation of Racing Commission Rules for which he had been recently disciplined by the Commission. It is undisputed that prior to exercising its rights under the stall agreement, Mountain Laurel's management met with the presiding racing judge and racing secretary who confirmed the allegations of inconsistent driving against Fitzgerald. Plainly, the racing judges possessed delegated authority from the Commonwealth of Pennsylvania to discipline Fitzgerald for inconsistent driving following a hearing under the Racing Commission Rules. Yet no decision to suspend Fitzgerald was made at

8. The Supreme Court in *Jackson, supra,* 419 U.S. at 357, 95 S.Ct. 449, 42 L.Ed.2d 447, also discussed "the symbiotic relationship presented in *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961)" and seemingly left it intact.

Mountain Laurel's meeting with the racing officials. Rather, from that meeting emanated Mountain Laurel's decision to evict Fitzgerald under the option to vacate in the stall agreement. The decision to evict Fitzgerald was communicated to him by the racing secretary, allegedly acting solely in his capacity as a representative of management, in the presence of the racing judges. These crucial facts provide the predicate to which we must apply the Supreme Court's pronouncements on state action to determine if state action is present.

Fitzgerald vigorously asserts that the very interrelationship of the State with private racing associations constitutes a "symbiotic relationship" like that involved in *Burton* and affords him the protective embrace of the fourteenth amendment. Although Mountain Laurel is a private corporation, Fitzgerald points to Pennsylvania's extensive regulation of racing operations requiring that track management and racing participants be licensed. Furthermore, Pennsylvania through its Racing Commission delegates significant authority to racing officials who, although privately employed by the racing association, nevertheless have broad authorization from the State to enforce Racing Commission Rules. Pennsylvania also has a substantial financial interest in harness racing inasmuch as it collects tax revenues from the racing associations. Fitzgerald accordingly concludes that harness racing is essentially a joint venture between state and private enterprise in Pennsylvania and that a *Burton* symbiotic relationship is present.

Mountain Laurel responds by analogizing the harness racing business to the heavily regulated businesses in *Moose Lodge* and *Jackson* in which no state action was found. Like Moose Lodge No. 107, Mountain Laurel is a privately owned entity operating on private property. Heavy regulation by the Racing Commission, like the Liquor Control Board in *Moose Lodge* and the Public Utility Commission in *Jackson,* is insufficient to establish a symbiotic relationship between the State and Mountain Laurel under *Burton* unless the regulation is so pervasive as to make Mountain Laurel's activities a joint venture with the State.

Mountain Laurel depends strongly on a Fifth Circuit case, *Fulton v. Hecht,* 545 F.2d 540 (5th Cir.), *cert. denied,* 430 U.S. 984, 97 S.Ct. 1682, 52 L.Ed.2d 379 (1977) for the proposition that no symbiotic relationship exists between the State and a private racing association. That case rejected the contention that a symbiotic relationship existed between the State of Florida and a private dog racing club despite extensive state regulation, sharing of dog racing revenues and state auditing of the racetrack books. The kennel club in *Fulton* was, like Mountain Laurel, a private corporation. The club refused to renew a booking contract of a dog racer, who then sued under section 1983 to enjoin that act. The Fifth Circuit held:

> We think the dog racing industry can be analogized to the public utility situation. Because of the very nature of the industry, it must be regulated to protect the public. Even though the regulation might be extensive, it cannot, in any *realistic sense,* make the State a partner in the endeavors of the Kennel Club.

*Id.* at 542 (emphasis in original).

The Fifth Circuit emphasized that the kennel club was not a lessee of public property and that the financial benefits accruing to the State did not automatically convert private acts into state action. *Id.* at 542–43.

■ We agree with the Fifth Circuit that the State's relationship to the heavily regulated racing industry is not sufficient to establish a symbiotic relationship under *Burton.* Although we agree with the district court in this case that the State's relationship with Mountain Laurel is "decidedly more symbiotic" than the State's relationship with the public utility in *Jackson,* we do not think the relationship is one which makes the State a joint venturer with Mountain Laurel. We cannot say that every act of Mountain Laurel is an act of the State. We therefore reject Fitzgerald's claim of state action under *Burton.*

This does not end our inquiry, however, because as Judge Adams stated in *Braden II,* there may be a close nexus between the

State and the challenged private action sufficient to warrant a finding of state action under *Jackson,* even if a *Burton* symbiotic relationship is absent. We must therefore turn our analysis toward the nature and extent of the State's involvement in the expulsion of Fitzgerald under the stall agreement.

■ To establish the presence of state action under *Jackson,* Fitzgerald must show a sufficiently close nexus between the State's participation in harness racing and Mountain Laurel's act of expelling him so that Mountain Laurel's act "may be fairly treated as that of the State itself." *Jackson, supra,* 419 U.S. at 351, 95 S.Ct. at 453. The key issue under *Jackson* is whether the State participated in the challenged conduct itself by "putting its weight" behind the challenged activity. Without such intimate involvement by the State in the private act, there is an insufficient nexus between state and private activity to warrant a finding of state action.

Mountain Laurel vigorously asserts that its act of expelling Fitzgerald derived solely from its common law property rights as a lessor to expel Fitzgerald under the terms of the stall agreement. Fitzgerald had been suspected of violating Racing Commission Rules prohibiting inconsistent driving. Management's confirmation of this suspicion at a meeting with State racing officials before expelling Fitzgerald does not, it asserts, transmute a private act into state action because it had the independent authority to expel Fitzgerald *for any reason* under the terms of the stall agreement. Mountain Laurel in essence posits two independent, concurrent spheres of disciplinary authority over individuals like Fitzgerald. On the one hand, the State delegates powers to racing officials to impose sanctions on drivers who do not comport with Commission Rules; on the other hand, a private racing association possesses common law property rights to exclude or expel any individual it considers undesirable. The key difference is that the State must provide a hearing comporting with the strictures of the Due Process Clause of the fourteenth amendment; a private association is under no such compulsion.

There can be little doubt that a private racing association like Mountain Laurel does possess private property rights.[9] *Martin v. Monmouth Park Jockey Club,* 145 F.Supp. 439 (D.N.J.1956), *aff'd,* 242 F.2d 344 (3d Cir. 1957) (track may exclude a licensed jockey from racing at the track). Mountain Laurel's position is that its private property rights are broad enough to sanction exclusion of Fitzgerald even though it was the violation of Racing Commission Rules that triggered the exercise of those rights. Such an interpretation of the facts, however, ignores the pervasive presence and authority of the State in participating in Fitzgerald's summary expulsion.

The district court specifically found:

[P]laintiff was suspended and evicted for allegedly violating a rule of the Pennsyl-

---

**9.** In fact, Pennsylvania's legislation regulating parimutuel *thoroughbred horse racing* activities in the State and the corporations engaged therein, specifically provides that any association licensed by the Commission "may refuse admission to and eject from the enclosure of the race track . . . any person" except for racial or other discriminatory reasons. Pa.Stat. Ann. tit. 15 § 2662.1(b) (Purdon Supp.1978–79). Relying on statutory language empowering the State Horse Racing Commission or a racing association to deny or eject any person whose presence "in the sole judgment of the State Horse Racing Commission" is deemed detrimental to the best interests of racing, Pennsylvania's Commonwealth Court has held that the common law right of a race track to expel a patron without cause and without a hearing is abolished. *Rockwell v. Pennsylvania State Horse Racing Commission,* 15 Pa.Cmwlth. 348, 327 A.2d 211, 213 (1974). Asserting that the language of the thoroughbred horse racing statute is similar to the Harness Racing Act cited by the district court in this case, Pa.Stat.Ann. tit. 15 § 2610.1 (Purdon Supp.1978–79), Fitzgerald argues that common law property rights of harness racing associations to evict persons have been eroded by the decision in *Rockwell. Rockwell* is helpful to Fitzgerald only to the extent that both statutes restrict private property rights by requiring a hearing in the event of an eviction of a licensed employee for conduct detrimental to the best interests of racing. Pa.Stat.Ann. tit. 15 §§ 2662.1(c); 2610.1 (Purdon Supp.1978–79).

vania State Harness Commission, an agency of the Commonwealth of Pennsylvania, that the defendants were specifically authorized by the state to enforce this rule, and that the asserted concurrent basis of private authority neither attenuates nor mitigates these facts.

464 F.Supp. at 268.

The district court further noted that the rental of stall space was not a prerequisite to driving and training horses at the Meadows.[10] Nonetheless, Mountain Laurel's act of expelling Fitzgerald from the stall space had the extreme effect of barring him from any activity at the track. Thus, the district court found that Fitzgerald's eviction "went far beyond a simple eviction from rented space." *Id.* Indeed, the gravamen of Fitzgerald's complaint centers not on the denial of stall space but on the effect of the expulsion which prevents him from training and driving horses at the Meadows. Complaint ¶ 21. Mountain Laurel argues that there is neither an allegation nor an indication of any evidence that the State participated directly or indirectly in the demand that plaintiff leave the racetrack premises. We disagree.[11]

The findings of the district court manifest a close nexus between Pennsylvania's interest in regulating harness racing and Mountain Laurel's act of evicting Fitzgerald under the delegated authority to Racing Commission officials sufficient to establish the presence of state action under *Jackson.* Mountain Laurel may indeed possess common law property rights to evict for any reason whatsoever an individual from its track, but in this case, whatever private rights were exerted were specifically linked to the enforcement of Racing Commission Rules. Moreover, the district court found that Fitzgerald was suspended because "defendants felt that he had violated Commission Rule 18 § 5(c)(2) dealing with inconsistent driving." 464 F.Supp. at 268. The sequence of events is crucial. Mountain Laurel's eviction of Fitzgerald came only *after* a meeting with the racing officials who confirmed the renewed allegations of inconsistent driving. Although the racing officials' salaries are paid by Mountain Laurel, it is undisputed that in rendering their opinion of Fitzgerald's conduct, they were acting pursuant to their delegated authority from the State to oversee the conduct of the races. Thus, Mountain Laurel's argument that two independent concurrent spheres of authority exist and that it acted solely in its private capacity, breaks down in light of the realities of the expulsion. As the district court noted, the defendants although claiming to have acted under a contractual right to evict from the rented stall, cited a Commission Rule violation when they acted and "went far beyond a simple eviction from rented space." *Id.* The racing association was not empowered by the rule or statute to enforce the Commission Rules.

Mountain Laurel protests that the State had no authority to enforce the terms of the stall agreement and that the State did not

---

10. Drivers could race horses at the track without entering into any stall agreement. The district court observed that "[t]he parties agreed . . . that rental of stall space was not a prerequisite to *driving* and *training* horses at the Meadows and that many active drivers and trainers there keep their horses at stalls not controlled by Mountain Laurel." 464 F.Supp. at 268 (original emphasis). We find nothing in the record, however, to support this observation as to trainers.

11. The cross-examination of Kenneth Marshall, the racing secretary, supports the finding of the district court that Fitzgerald was expelled for the violation of a Racing Commission rule:

Q. So that you were not expelling him for the reason that he was a person who was undesirable under that statute or rule but only for management's reasons of wanting him off the track?

A. No. I think while we were at the meeting that day in the morning that certainly these rules and regulations were discussed in that meeting, and these rules and regulations had the basis of our action, yes.

Q. So that in essence what you are saying is that because of powers conferred upon you or for violations of the rules, you were expelling him?

A. Yes, sir.

MR. HERSHEY: Your Honor, I don't think that last question accurately reflects the witness' testimony.

THE COURT: But his answer did.

Record at 109.

"put its weight" behind the eviction. Mountain Laurel's argument misses the critical features of this case: the presiding racing judge and racing secretary, acting in their official capacities, *participated* in the decision to expel Fitzgerald.[12] In so doing, the racing officials "put their weight" behind the challenged expulsion by telling Mountain Laurel that Fitzgerald was violating Commission Rules and by approving the ensuing expulsion.

In *Jackson,* the Public Utility Commission's role in the termination of electrical service to the plaintiff was simply that it had approved a general practice authorizing termination under Metropolitan Edison's general tariff. 419 U.S. at 348, 95 S.Ct. 449. There was no other evidence of Commission participation in the termination of the plaintiff's electrical service. The Supreme Court appropriately concluded that the relationship of the Commission to the challenged act was too remote to transmute the private act into state action. In the present case, however, the State did more than merely adopt a regulation prohibiting inconsistent driving. Officials of the Racing Commission personally and actively participated in the specific conduct challenged

by Fitzgerald. Their opinion as "racing officials and judges" of Fitzgerald's conduct precipitated the ensuing summary expulsion. This is hardly the remote action presented by *Jackson.* After carefully "sifting facts and weighing circumstances," *Burton, supra,* 365 U.S. at 722, 81 S.Ct. 856, we conclude that the totality of the circumstances demonstrate that Mountain Laurel's eviction of Fitzgerald must be fairly considered as the disciplinary act of the State.

We do not perceive the Fifth Circuit's holding in *Fulton* to be inconsistent with a finding of a close nexus in this case. In *Fulton,* the court declined to find a close nexus in the kennel club's refusal to renew the dog racer's booking contract because the State in no way regulates booking contracts and because the racer failed to show "that the state either directly or indirectly participated in the decision not to renew his contract." 545 F.2d at 543. By contrast, in this case, Pennsylvania must approve the stall agreement before it may be utilized,[13] and Fitzgerald has shown that the racing officials participated in management's decision to expel him. Thus, Fitzgerald has made out a convincing case of state participation in the challenged activity.

**12.** The dissent characterizes the judge's and secretary's activities as "consultations." We believe this conduct amounted to considerably more than mere consultations. *See* n. 11 *supra.* Furthermore, Kenneth Marshall, the racing secretary, admitted on direct examination that he told Fitzgerald that:

> Mr. Knight [the presiding judge] and myself and management had met earlier in the day and that based upon three incidents one being a penalty that happened earlier in the year and secondly, two cases in which, *in our opinion, racing officials and judges,* seemed to be a reoccurrence of inconsistent racing that management had expressed a concern and felt that it was detrimental to their business; and therefore, had requested that I pass the information along to Mr. Fitzgerald and that they were going to invoke their prerogative as in Paragraph 7 of the stall contract.

Record at 121–22 (emphasis supplied).

**13.** The dissent focuses upon the State's approval of the stall agreement as the critical issue under the close nexus test. Dissent at 605 n. 4. The State does approve the general terms of the stall agreement before it can be used. The dissent, however, asserts that pro forma ap-

proval of the stall agreement by the Racing Commission is insufficient by itself to establish a close nexus under *Jackson.* We do not disagree on this point. We agree if the State's participation were limited to a pro forma approval of the stall agreement, there conceivably would be no close nexus under *Jackson.* However, there is considerably more here to constitute state action.

The dissent distinguishes this case from *Public Utilities Commission v. Pollak,* 342 U.S. 451, 72 S.Ct. 813, 96 L.Ed. 1068 (1952) in which the District of Columbia Public Utilities Commission's specific approval of the playing of radio programs on privately owned and operated streetcars and buses was held to be sufficient governmental action to allow first and fifth amendment claims to be brought. *Id.* at 462. But here, perhaps more than in *Pollak,* the Commission directly participated in the private conduct through the racing officials' meeting with management and by their activity in the decision to expel. We emphasize that it is the participation in the challenged activity which is the critical factor in establishing state action, and not the mere state approval of the stall agreement.

We wish to emphasize that not every private act of a racing association like Mountain Laurel will be considered to be state action. The dissent expresses considerable concern over potential restrictions on private management's ability to expel or fire an undesirable employee. It illustrates this concern with two examples of extensively regulated businesses, the one a commercial bank discharging an officer for misapplication of bank funds, a statutory violation, and the other a gambling casino discharging an employee for misconduct. In each instance, the employer has acted after conversations presumably with state investigators. The dissent interprets our holding as requiring that such an act be considered state action. However, the facts and the issue in the examples differ from the present case.

■ Mountain Laurel conceivably may have private property rights to expel an individual like Fitzgerald because it suspects a violation of Commission Rules which renders such an individual an undesirable participant in the track's races. We hold today that it is only when the state officials with delegated authority to enforce state laws or regulations *participate* with management in the decisional process to expel for a violation of a State Commission Rule is the requisite nexus under *Jackson* established.[14] The essence of state action is supplied by the presiding judge and racing secretary's meeting with management to analyze Fitzgerald's conduct and officially participating in reaching the decision to expel. In terms of the dissent's analogies, no official possessing delegated state authority participated with management in the decisional process to discharge the employee for misconduct in violation of state law. We perceive no question of a close nexus between state and private action when the private activity, totally independent of any official state participation, results in the discharge of a person for violation of state law.[15]

### V.

■ Once state action is present, the requirements of due process must be met notwithstanding the concurrence of private action. When the two coalesce because of the exercise of the public power and participation by the State with a private enterprise in the challenged activity, the resultant conduct must be characterized as state action requiring due process.

■ Even if the requisite state action is present to anchor jurisdictionally Fitzgerald's section 1983 claim for injunctive relief, we still must consider whether the district court properly granted that relief. In order to issue a preliminary injunction, the court must consider and weigh whether:

(1) The plaintiff will suffer irreparable harm if relief is not granted.

(2) The defendant will be harmed if relief is granted.

(3) The public generally will be harmed if relief is granted.

---

14. The district court also found state action present in the State's delegation of authority to hire private security guards who have power to enforce the criminal laws of the State at the private tracks. 464 F.Supp. at 268. We note that this question was expressly left open by the United States Supreme Court in its most recent pronouncement on state action, *Flagg Bros., Inc. v. Brooks,* 436 U.S. 149, 163–64, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1977). Because the record does not reveal that Fitzgerald was ejected by a private security guard, and because we have already found state action to be present, we need express no opinion on the issue reserved in *Flagg Bros.*

15. The dissent is concerned that our decision produces undesirable policy results. We do not so view our holding. Our holding means that state action is implicated when state officials in an extensively regulated industry participate and "put their weight" behind the challenged private act. Had Mountain Laurel acted independently without the racing officials having participated in the expulsion, our decision conceivably might have been different. Had an official of the State Liquor Control Board in *Moose Lodge* officially participated in the expulsion of Irvis, the patron, for racial reasons, or had a member of the Public Utility Commission in *Jackson* participated in the termination of electrical service, the courts might have found the requisite close connection between state and private action. Hence, we do not perceive any dire anomalies flowing from our holding today.

(4) The plaintiff is likely to prevail on the merits of his claim.

*Delaware River Port Auth. v. Transamerican Trailer Transport, Inc.*, 501 F.2d 917, 919–20 (3d Cir. 1974). The district court resolved these factors in favor of the plaintiff and issued the preliminary injunction. The court found: (1) Fitzgerald will suffer irreparable harm because the nature of harness racing is such that no adequate remedy exists at law to compensate him for losses to income and reputation sustained from an unlawful suspension. (2) There is no evidence that Mountain Laurel will be adversely affected if Fitzgerald is allowed to continue racing. (3) There is no evidence that the public will be similarly adversely affected. (4) Fitzgerald established a case of deprivation of due process under the fourteenth amendment.

We agree with the district court that Fitzgerald has established the possibility of irreparable injury "to his business and reputation" from an alleged violation of a Commission Rule implying dishonest racing to warrant a preliminary injunction. The record reveals that Fitzgerald's income was in large part directly related to his ability to race at the Meadows. The eviction had the effect of denying him the right to pursue his license to drive and train horses. In *Bell v. Burson*, 402 U.S. 535, 539, 91 S.Ct. 1586, 1589, 29 L.Ed.2d 90 (1971), the Supreme Court stated:

> Once licenses are issued, . . . their continued possession may become essential in the pursuit of a livelihood. Suspension of issued licenses . . . involves state action that adjudicates important interests of the licensees. In such cases the licenses are not to be taken away without that procedural due process required by the Fourteenth Amendment.

*See Whetzler v. Krause*, 411 F.Supp. 523, 527 (E.D.Pa.1976), *aff'd*, 549 F.2d 797 (3d Cir. 1977). We also agree that this record reveals no evidence of grave harm to Mountain Laurel or the public resulting from Fitzgerald's continued activities at the track. The fourth factor, that of likelihood of success on the merits,[16] is more troublesome and requires an inquiry into whether Fitzgerald properly established a case of unconstitutional deprivation of his right to procedural due process under the fourteenth amendment.

Mountain Laurel contends that Fitzgerald can show no deprivation of procedural due process because he failed to exhaust administrative remedies available to him.[17] The district court held that no exhaustion of administrative remedies is required in section 1983 suits. *U. S. ex rel. Ricketts v. Lightcap*, 567 F.2d 1226, 1229 (3d Cir. 1977). 464 F.Supp. at 268–69. Mountain Laurel relies on a footnote in *Lightcap* acknowledging a line of cases holding that where the plaintiff claims deprivation of property without due process of law, he must first use state processes open to him to redress the alleged deprivation. *Id.* at 1232 n. 5. Mountain Laurel's reliance on this footnote is misplaced for two reasons. First, the district court significantly found that it was Fitzgerald's *liberty* interest that was subject to constitutional deprivation. Second, *Lightcap* expressly declined to consider whether a qualified exhaustion rule should be adopted in this Circuit in cases of alleged deprivation of property rights without due process of law. *Id.* at 1231–32. When federal jurisdiction is invoked under section 1983 on the ground of fourteenth amendment violations, a plaintiff is not required to first exhaust his remedies elsewhere.[18] *Steffel v. Thompson,*

---

**16.** Because we affirm the district court's finding of state action, any jurisdictional impediments raised by Mountain Laurel to Fitzgerald's success on the merits of his section 1983 claim are now rejected.

**17.** Specifically, Mountain Laurel argues that Fitzgerald could have filed a complaint under Rule 26, § 3 of the Racing Commission Rules or filed an appeal to the Harness Racing Commis-

sion under Pa.Stat.Ann. tit. 15, § 2610.1 (Purdon Supp.1978–79).

**18.** Even if an appeal under the Commission rules was available from the decision to evict, there is a serious question whether the remedy would have been adequate. The Supreme Court has held, although in another context, that a deprivation of due process at the magisterial level is not constitutionally acceptable

415 U.S. 452, 472–73, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974); *Hochman v. Board of Education of City of Newark,* 534 F.2d 1094, 1097 (3d Cir. 1976).

We must then consider whether Fitzgerald adequately demonstrated the likelihood of a procedural due process violation. The district court, as we have just noted, found that Fitzgerald had a liberty interest in his employment reputation protected by the Due Process Clause of the fourteenth amendment. In addition, Mountain Laurel had officially recognized Fitzgerald's status as a state licensed trainer and driver by allowing him to perform these activities at the track. His summary expulsion significantly altered a "status previously recognized by state law," *Paul v. Davis,* 424 U.S. 693, 711, 96 S.Ct. 1155, 1165, 47 L.Ed.2d 405 (1976), and denied him the opportunity of earning a livelihood. We, therefore, agree that Fitzgerald has a cognizable liberty interest under the Supreme Court's definition of liberty in *Paul v. Davis, supra,* and *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).

Judge Adams expresses concern whether Fitzgerald's liberty interest is implicated in this case. He doubts whether a stigma will be attached to Fitzgerald's business reputation because Mountain Laurel's decision to expel him need not be communicated to the

Racing Commission and other racetracks under Commission Rule 23 § 8. We believe, however, that the dissent misreads this Rule which states: "Whenever a person is excluded from a track by an association, the Commission shall be notified. The Commission in turn shall notify all other associations in the Commonwealth of Pennsylvania and may notify the United States Trotting Association." The dissent asserts that there is no indication that Mountain Laurel did report or intended to report Fitzgerald's expulsion to the Commission. However, Mountain Laurel was required to so report, and we believe that it was reasonable for the district court to assume that such a report would be made. For purposes of a preliminary injunction, we believe Fitzgerald has established with a reasonable likelihood an injury to his business reputation.[19] The district court proceeded to consider whether Fitzgerald was accorded due process and concluded that he was not. It noted that due process generally requires a pre-suspension hearing unless some extenuating private or public interest of overriding significance exists to justify postponement. *Boddie v. Connecticut,* 401 U.S. 371, 377, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971). The district court concluded that because Fitzgerald was neither given a pre-eviction hearing, nor afforded a post-eviction hearing, his procedural due process rights were violated.[20] Thus, Fitzgerald showed a likeli-

---

because the State offers an impartial adjudication on an appeal and trial *de novo* in the county court. The plaintiff is "entitled to a neutral and detached judge in the first instance." *Ward v. Village of Monroeville,* 409 U.S. 57, 61–62, 93 S.Ct. 80, 84, 34 L.Ed.2d 267 (1972).

19. The dissent also avers that the complaint does not sufficiently allege damage to Fitzgerald's reputation. Dissent at 610. We believe that the complaint when viewed in the light most favorable to Fitzgerald adequately pleads a liberty interest. Fitzgerald's concern is that Mountain Laurel's actions deprive him of his "right to earn his livelihood." When broadly construed, it implicates his liberty interests. Complaint ¶ 27.

Finally, the dissent contends that no stigma can attach because Fitzgerald has not denied the truth of the charges leveled against him. Dissent at 610. However, there would be little

reason to demand a hearing unless Fitzgerald desired to vindicate his reputation for the allegations of inconsistent driving. We believe that the denial of a hearing deprives him of the opportunity to deny the charges and that he has sufficiently shown injury to his business reputation to warrant preliminary injunctive relief.

20. Fitzgerald was expelled from the track on August 19, 1978, without a hearing. On August 24, he applied for a temporary restraining order which was denied. The district court fixed a hearing on the application for a preliminary injunction on August 28. Although eleven days had elapsed since the expulsion, no post-termination hearing had been proffered to Fitzgerald. Only after the preliminary injunction had been granted did Mountain Laurel make an offer of some form of post-termination hearing. The district court found that offer unacceptable for reasons discussed *infra.*

hood of success on the merits of his constitutional claim to warrant preliminary injunctive relief.

The district court's analysis of Fitzgerald's procedural due process claim may have been accurate at the time its opinion was delivered. However, we must reevaluate that analysis in light of the United States Supreme Court's recent decision in *Barry v. Barchi,* —— U.S. ——, 99 S.Ct. 2642, 61 L.Ed.2d 365 (1979). In that case, the Court held that a suspended harness racing trainer was not constitutionally entitled to a pre-suspension hearing, although a prompt post-suspension hearing was constitutionally required under the Due Process Clause of the fourteenth amendment. —— U.S. at ——, 99 S.Ct. 2642. The question then is to what type of hearing would Fitzgerald be entitled under the Court's analysis in *Barchi.*

Unquestionably, Fitzgerald was given no pre-eviction hearing, but *Barchi* would under circumstances jeopardizing the integrity of the sport now make such a denial constitutionally permissible. Assuming *arguendo* that the State's interest in preserving the integrity of the sport required Fitzgerald's immediate suspension,[21] the sole issue then is whether Fitzgerald was afforded a prompt post-eviction hearing. *Barchi* indicates that a post-suspension hearing must proceed without delay:

> Once suspension has been imposed, the trainer's interest in a speedy resolution of the controversy becomes paramount . . . . We also discern little or no state interest, and the State has suggested none, in an appreciable delay in going forward with a full hearing.

*Id.* Fitzgerald was offered no prompt post-eviction hearing at the time of his eviction.

Once the district court issued the injunction on August 31 prohibiting Fitzgerald's expulsion, Mountain Laurel filed a motion on September 1 to invoke procedures under the Harness Racing Commission Rules and Regulations.[22] In essence, Mountain Laurel then proposed to bring the charge of inconsistent driving before the racing judges, who after notice and a hearing, would decide whether Fitzgerald had violated Racing Commission Rules.

Fitzgerald opposed Mountain Laurel's motion on the ground that he could not get a fair hearing before the same judges who had participated in Mountain Laurel's decision to evict him. Fitzgerald proposed that Mountain Laurel instead commence proceedings under Rule 26 of the Racing Commission Rules by filing a complaint with the Commission. The Commission would then after notice and a hearing determine whether Fitzgerald had violated Commission Rules. At this hearing, Mountain Laurel's judges would only be witnesses and would not adjudicate Fitzgerald's rights. The district court agreed, denying Mountain Laurel's motion, but without prejudice to its institution of procedures under Rule 26.[23] The district court did not reach the issue of the constitutional adequacy of the Racing Commission's post-suspension hearing procedures themselves.

Mountain Laurel claims that the district court's denial of the motion to invoke Racing Commission procedures before the judges was an abuse of discretion. It argues that Fitzgerald would have received due process before the judges who would now be acting solely in their capacity as state officials. Mountain Laurel complains that the district court's action gave Fitzgerald a preferred status at the track, inas-

21. In the present posture of this case, we need not decide whether inconsistent driving in Pennsylvania poses such a serious risk to the integrity of harness racing and the public interest to justify immediate suspension without a hearing.

22. Mountain Laurel did so in order to avoid any possible conflict with the preliminary injunction.

23. Judge Diamond stated: "I feel that to follow the procedure which you [Mountain Laurel] prescribe now after all that has transpired would make a mockery of what has transpired." Record at 27. The district court was also concerned with the constitutionality of having racing judges act as prosecutor, judge, and jury, but because the constitutionality of the Racing Commission procedures was not directly attacked, it did not reach this issue.

much as Fitzgerald could not be suspended by the racing judges for the alleged violations of inconsistent driving.

We perceive no abuse of discretion in the district court's order. It is very possible that Fitzgerald could not have received an impartial hearing before Mountain Laurel's judges after their participation in the decision to evict him. On the other hand, the district court left open an untrammeled avenue for a hearing before an impartial tribunal under Rule 26. The incidental preferred status afforded Fitzgerald by the district court's order was due only to Mountain Laurel's inability to afford him an impartial hearing and would last only as long as such a hearing was denied. We therefore affirm the district court's order denying Mountain Laurel's motion without prejudice to it to initiate procedures under Rule 26.

Thus, we cannot say that Fitzgerald was afforded the prompt post-suspension hearing envisioned by *Barchi*. This is not to say that had Mountain Laurel offered a hearing under Rule 26, that hearing would not have satisfied the requirements of *Barchi*. We need not reach that issue on the record before us. We hold only that Fitzgerald has adequately shown likelihood of success on his procedural due process claim to merit the issuance of the preliminary injunction.[24]

Having concluded that the requisite state action for a section 1983 suit was present, and that Fitzgerald has met the essential requirements for issuance of a preliminary injunction, the judgment of the district court is affirmed. Costs taxed against appellant.

ADAMS, Circuit Judge, dissenting.

William Fitzgerald, a horse trainer and driver whose at-will stall agreement was terminated by Mountain Laurel Racing, Inc. because it believed he was driving horses that had been racing inconsistently,[1] has brought this suit under 42 U.S.C. § 1983, a civil rights statute. To prevail under this enactment Fitzgerald must demonstrate that the defendants, under color of state law, deprived him of a constitutional right. The district court and now a majority of this Court have agreed with Fitzgerald that the termination of the stall agreement is properly termed, under the circumstances of this case, "state action."[2] They have also decided that the failure of Mountain Laurel and its officials to provide Fitzgerald with a hearing in connection with the termination of the stall agreement amounts to a deprivation of his liberty without due process of law—a constitutional violation. The majority does not address definitively, however, some of the problems inherent in the preliminary injunction itself. For the

---

**24.** The dissent is under the impression that the preliminary injunction requires the issuance of a stall agreement to Fitzgerald for future racing seasons, even though rights under the stall agreement were limited to 1978; that it extends beyond a period of time necessary to preserve the status quo ante and unduly burdens Mountain Laurel by "forcing [it] to issue a permit to a person whom it otherwise has the legal right to refuse." Dissent at 611. The order granting the injunction, however, is drawn much more narrowly as to time and is limited to a period "pending the final determination of this action or until further order of this court . . . ." Until the final determination of the rights of the parties in this proceeding, the court has not adjudicated the future rights of the plaintiff to stall, and also to train or drive horses or to make other use of Mountain Laurel's facilities.

**1.** Fitzgerald did not allege that Mountain Laurel terminated the stall agreement because Fitz-

gerald had been driving inconsistently. Rather, the complaint avers that Mountain Laurel acted "solely due to the allegation of inconsistency of the three horses." App. 9a. The distinction between "inconsistent driving" and "driving inconsistent horses" has been blurred throughout this litigation. The charge of "driving inconsistent horses" refers only to the performance of the *horses*. In contrast, "inconsistent driving" implies some degree of improper motive or lackadaisical behavior on the part of the *driver*. Because Fitzgerald claims only that Mountain Laurel suspected him of "driving inconsistent horses," this opinion proceeds on that basis.

**2.** The "under color of state law" requirement of section 1983 has been treated as essentially congruent with the "state action" requirement of the fourteenth amendment. *See, e. g., Braden v. University of Pittsburgh*, 552 F.2d 948, 955 n.34 (3d Cir. 1977) (en banc) (listing authorities).

reasons set forth in this opinion, I respectfully dissent.

## I.

The majority's description of this case as requiring yet another "plunge . . . into the murky waters of the state action doctrine" is quite apt. Few, if any, of the recent Supreme Court pronouncements on this subject have gone uncriticized; and, if the commentators differ about which precedents to assail and which to defend, there is virtual unanimity regarding the lack of a coherent state action doctrine.[3] The paucity of consistent principles makes any adjudication in this area difficult, particularly when, as is true here, the evidence adduced in the district court reasonably lends itself to varying interpretations.

As the majority opinion demonstrates, two different approaches to the state action question might be applied here. First, it might be argued that state regulation of harness racing in Pennsylvania is so pervasive, and the relationship between the Commonwealth and the private racetracks so interdependent, that the acts of the track are inseparable from the acts of the government. *See Burton v. Wilmington Parking Authority*, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961). The question for resolution under such an analysis is whether a "symbiotic relationship" may be said to exist between Pennsylvania and its privately licensed racetracks.

Although the majority declares that the state's connections with Mountain Laurel are "decidedly more symbiotic" than was the state's relationship to the public utility in *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974), it decides that the claimed interdependence is not sufficient to meet the symbiotic relationship test. "We cannot say," the majority concludes, "that every act of Mountain Laurel is an act of the State." Majority opinion, *supra*, at 596. This position accords with that taken by the Court of Appeals for the Fifth Circuit in *Fulton v. Hecht*, 545 F.2d 540 (5th Cir.), *cert. denied*, 430 U.S. 984, 97 S.Ct. 1682, 52 L.Ed.2d 379 (1977). Although the question is a close one, I am persuaded by the majority's reasoning that no symbiotic relationship exists here.[4]

The majority predicates its decision on the second approach, the "close nexus" test of *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974). It is from this proposition that I primarily diverge from the majority.

In *Jackson*, the Supreme Court, assessing whether a heavily regulated, privately owned utility company's termination of service to a customer was state action, held

---

**3.** *See, e. g.*, A. Bickel, The Supreme Court and the Idea of Progress 65–70 (1970); J. Nowak, R. Rotunda & J. Young, Constitutional Law 473–75 (1978); L. Tribe, American Constitutional Law § 18–2, at 1156–57 (1979).

**4.** Had the Pennsylvania Racing Commission specifically approved the terms of the stall agreement and their implications, there arguably would be state action under the doctrine of *Public Utilities Commission v. Pollak*, 343 U.S. 451, 72 S.Ct. 813, 96 L.Ed. 1068 (1952). In *Pollak*, a passenger of the Capitol Transit Company, a District of Columbia railway and bus service, sued to enjoin the company from playing radio programs on its streetcars and buses. Plaintiff alleged that the programs violated his first and fifth amendment rights. Transit's operations were extensively regulated by the utilities commission; and the commission investigated Transit's use of the radio programs, held public hearings, and concluded that the programs did not impair the public's safety, comfort, or convenience. The Supreme Court held

that the commission's specific approval of Transit's actions caused the latter to be state action. *Id.* at 462, 72 S.Ct. 813.

In this case, although the Racing Commission received the stall agreement form, there is nothing in the record to suggest that the Racing Commission's review, if there was any at all, was anything but *pro forma*. Unlike the investigation in *Pollak*, the Commission did not "put its own weight on the side of the proposed practice." *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 357, 95 S.Ct. at 456 (1974). If there were evidence that the Commission carefully reviewed the terms of the stall agreement and signaled its approval of the terms on policy grounds, this Court could more readily infer that the Racing Commission sought to use the stall agreement to help enforce the state's goal of disciplining inconsistent drivers. Short of this kind of state involvement, however, the *Pollak* rationale would not appear to apply.

that "the inquiry must be whether there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself." *Id.* at 351, 95 S.Ct. at 453. In this case, the majority concludes that the *Jackson* test is satisfied because "the presiding racing judge and racing secretary, acting in their official capacities, *participated* in the decision to expel Fitzgerald." Majority Opinion, *supra,* at 599 (emphasis in original; citation omitted). I believe that this application of *Jackson* to the facts of this case is incorrect. Further, I am concerned that today's decision might lead to an unprecedented degree of federal constitutional control over a broad range of heretofore private transactions.[5]

The hearings conducted by the district court revealed that Mountain Laurel and the Pennsylvania State Harness Racing Commission each possess independent, though often complementary, authority over racetrack operations. The Commission is charged with establishing rules and regulations governing the conduct of races and with licensing drivers, trainers, and other racing personnel. The Commission licenses several racetrack employees, racing judges and a racing secretary, to enforce on a daily basis the rules and regulations of the Commission and to administer various Commission policies.[6] Commission Rule 18, section 5 authorizes the racing judges to discipline any driver who engages in inconsistent,

careless, or indifferent driving.[7] In turn, Mountain Laurel retains primary responsibility over the track facilities, including the authority to contract privately to provide stall space and other services for racing personnel. Neither the Commission nor the secretary and judges have authority to intervene in these private contractual relations.

In its stall agreement with Fitzgerald, Mountain Laurel specifically reserved the right to terminate Fitzgerald's privileges, for any reason, on seventy-two hours notice. The racetrack management alone exercised that right because it suspected Fitzgerald's horses of racing inconsistently. The majority would transform this otherwise private act into state action because Mountain Laurel consulted with the racing judges and the secretary before making that decision.

The record indicates that the management of Mountain Laurel, upon suspecting Fitzgerald of driving inconsistent horses, took the only logical and prudent course available: they confirmed their suspicions with the persons designated by the Commonwealth to monitor racing behavior—the racing judges. The record is totally barren, however, of any suggestion that the judges or the racing secretary told the track management to terminate Fitzgerald's stall privileges or even encouraged it to do so. Rather, the record shows only that the secretary and judges, when asked, confirmed Mountain Laurel's suspicions and that Mountain Laurel, alone, then made the decision to terminate the stall agreement.

5. I am also concerned that the decision reached by the majority is contrary to the Supreme Court's recent refusal to define liberally state action in cases involving procedural due process claims. In both *Jackson* and *Flagg Bros., Inc. v. Brooks,* 436 U.S. 149, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978), the Court declined to find state action in transactions between private companies and customers who alleged that they had been denied the procedural guarantees of the fourteenth amendment. These cases may signal a reluctance on the part of the Supreme Court to impose federal constitutional standards on the *manner* in which private parties choose to deal with one another in a business context. Moreover, if the Court in *Jackson* declined to treat the power company, which exercised monopolistic control over two basic services—the supply of gas and electrici-

ty—as if it were the state, it is doubtful whether it would hold the activities of a private racetrack to be state action. *See generally* Choper, *Thoughts on State Action: The "Government Function" and "Power Theory" Approaches,* 1979 Wash.U.L.Q. 755, 774–80.

6. *See* Pennsylvania State Harness Racing Commission, Rules and Regulations, Rule 6, §§ 10–12, 23 (1977).

7. The record does not indicate that the Commission has authority, pursuant to this rule or any other rule, to discipline a driver or trainer because his horses had been racing inconsistently. Fitzgerald alleges only that his stall privileges were terminated because his horses were "inconsistent." *See* note 1 *supra.*

Although the racing judges and secretary appear to have been involved in the discussions that resulted in Mountain Laurel's decision to terminate Fitzgerald's stall privileges, I cannot agree with the majority that this involvement transmutes the racetrack's act into state action. The Commission and the racetrack each has strong interests in ensuring that races are conducted properly and that drivers and horses perform fairly and competitively in each race. The Commission acts, pursuant to Rule 18, to discipline drivers engaged in a pattern of inconsistent driving in order to vindicate the sporting and betting public's interest in honest racing. At the same time, Mountain Laurel can be expected to use its independent authority—such as revocation of stall privileges—to remove from the track horses it suspects of inconsistent racing in order to protect its own integrity and goodwill.[8] The two actions are complementary, but this confluence of interests does not mean that the state's interests must swallow the private right. In short, Mountain Laurel's decision to terminate Fitzgerald's stall agreement was independently motivated and executed pursuant to its own, exclusive authority.

The record is clear that Mountain Laurel itself, not the secretary or the judges, terminated the stall agreement. The track was without power to suspend Fitzgerald's license or to fine him, and neither the secretary nor the judges had any power to terminate his stall privileges. Although the track's decision was communicated to Fitzgerald by the racing secretary, the secretary in effect was acting as a messenger for his employer, the racetrack. The secretary possessed no power whatsoever to terminate the stall agreement between Fitzgerald and the track, or even to reprimand him for "driving inconsistent horses."[9] Moreover, Mountain Laurel in no way sought to invoke the authority of the Commission. Because Mountain Laurel, alone, possessed the power to terminate the stall agreement, its action—despite the involvement of the secretary and judges—remained private in nature.[10] Under these circumstances, I cannot agree that there was a close nexus between the state involvement—at most consultation and advice—and the challenged action of the regulated entity—an independently motivated decision based on Mountain Laurel's exclusive authority—such that the action of the latter may fairly be termed state action under *Jackson*.

My disagreement with the majority's application of the *Jackson* close nexus test to the facts of this case is underscored by concern regarding the possible extension of

---

8. Over twenty years ago this Court recognized the importance of a private race track's interest in protecting its good reputation when it affirmed Chief Judge Forman's opinion in *Martin v. Monmouth Park Jockey Club*, 145 F.Supp. 439 (D.N.J.1956), *aff'd*, 242 F.2d 344 (3d Cir. 1957). Judge Forman had noted:

> In a sport where the greatest importance should attach to dissipating any cloud of association with the undesirable, and in which the appearance as well as the fact of complete integrity is of paramount consideration, to exclude plaintiff from riding because of his record was an understandably warranted exercise of discretion.

*Id.* at 441.

9. The record does not even establish that the Commission has any authority to deal with "inconsistent horses." Rather, the Commission's power appears to be limited to disciplining the driver for his own allegedly errant conduct. *See* note 7 *supra*.

10. It is for this reason that I am not persuaded by the testimony of the racing secretary, Kenneth Marshall, that is set forth in footnotes 11 and 12 of the majority's opinion. The majority cites this testimony as evidence that racing officials participated in the decision to terminate Fitzgerald's stall agreement. The testimony certainly established that Mountain Laurel consulted with racing officials in order to determine whether Fitzgerald had been driving inconsistent horses. There is no evidence, however, that the racing officials compelled or even encouraged Mountain Laurel to revoke Fitzgerald's stall privileges, or in any way urged Mountain Laurel to use its authority to terminate the stall agreement in order to further the Commission's own regulatory purposes under Rule 18. In the absence of this kind of state involvement, and because neither the judges nor the racing secretary possessed any regulatory authority to terminate the stall agreement, I do not believe that Mr. Marshall's testimony is dispositive.

this holding to analogous situations. Two examples illustrate my apprehension.[11]

Commercial banks are heavily regulated by state and federal governments, yet they remain essentially private entities. As private businesses, they may hire and discharge their employees without providing them with hearings. Part of the system of state and federal regulation of banking includes a statutory prohibition against willful misapplication of bank funds. Suppose that a bank suspects one of its vice presidents of violating this statute and asks the Treasury Department to investigate. The investigators conclude that the vice president has willfully misapplied bank funds in violation of the statute and meet with bank officials to inform them of their conclusions. At this meeting, the bank decides that the proper course is to refer the matter to the United States Attorney and to discharge the vice president. I read the majority's opinion as requiring the bank to abide by the procedural requirements of the fifth amendment's due process clause because the bank officers made their decision to discharge the vice president in conjunction with the Treasury Department investigators. It is also worth noting that in this situation, as in the present case, only the bank has the authority to discharge employees; the Treasury officials, even if they "participated" in the decision, could only advise the bank regarding their investigative findings.

Similarly, states extensively regulate casinos, particularly to ensure that undesirable persons do not come to control or manipulate the industry. Suppose a casino suspects an employee of "fixing" a roulette wheel or of having contacts with organized crime—matters that would violate state law—and asks state gaming inspectors to investigate. The investigation then confirms the casino's suspicions, and the general manager of the casino decides to discharge the employee based on his conversations with the investigators. Here again, I am troubled that the majority's opinion would require a finding of state action, because of the investigators' participation in the discharge decision.[12]

Ironically, a finding of state action in these types of situations could well harm more employees, and persons like Fitzgerald, than it benefits. Employers can be expected to balk at adopting the panoply of procedures mandated by due process.[13] If consultation with regulatory officials brings about this burden, employers may be dissuaded from seeking advice from those in any way associated with governmental agencies before discharging employees suspected of impropriety. To the extent this occurs, there is a risk that more employees will be discharged summarily and erroneously than is the case today.

11. These analogies are given only as illustrations. It should be noted that although these examples concern employer-employee relationships, in the present case Fitzgerald is not an employee of Mountain Laurel.

12. I am also apprehensive that litigants in future cases might attempt to extend today's decision to nonregulated industries. The majority does not define the nexus between the state's general regulation of harness racing and the racing officials' participation in Mountain Laurel's decision to terminate Fitzgerald's stall privileges. It might be inferred from this that the majority attaches no significance to the Commonwealth's general regulatory involvement in the industry. A future litigant thus might argue that a grocery store, or other small nonregulated business, that discharges an employee after confirming its suspicions of his criminal misconduct with local law enforcement officials should be held to the strictures of procedural due process. Although such an in-terpretation of the majority's opinion is plausible, I read the decision as being limited to industries in which the state has assumed regulatory authority over a wide range of operations.

13. Even if the employer is willing to sacrifice the additional time and expense necessitated by hearings, a neutral arbiter, transcripts, and representation by counsel in order to discharge an employee it believes to be dishonest, it may still be burdened by the standard of proof that is required before the "state" sanction may be imposed. Whereas a private party may cease dealing with, or discharge from its employ, one whom it suspects of illegal or immoral conduct, the state may not act against such a person where the evidence is not as great as would be required at a formal hearing. *See Poisson v. State Harness Racing Comm'n*, 5 Pa. Cmwlth.Ct. 20, 287 A.2d 352, 855 (1972).

In sum, I agree with the majority that the relationship between Pennsylvania and Mountain Laurel is such that not every act of the track is attributable to the state. I also agree that there is nothing in Mountain Laurel's exercise of the stall agreement revocation clause that, by its nature, implicates the state in that agreement or in the exercise of the rights enumerated therein. I disagree only with the majority's determination that there is a sufficient nexus of state and private action when quasi-public officials participate in discussions that result in a business' decision to invoke its private contractual prerogatives.[14] In the present case, only Mountain Laurel, not the state, has acted so as to preserve the integrity of harness racing. Because I do not believe that its action is "properly attributable"[15] to the Commonwealth, I do not consider it to be state action under the federal Constitution or action under color of state law for purposes of § 1983.

## II.

Inasmuch as I conclude state action is not present here—because Mountain Laurel did not terminate its stall agreement with Fitzgerald "under color of state law"—it would follow that Fitzgerald was not deprived of a constitutional right when the stall agreement was cancelled. The Constitution does not protect a citizen from a private party's acts simply because such acts might have the effect of depriving him of what would be recognized for other purposes as a cognizable "property" or "liberty" interest.

Even if state action may be predicated on the facts of this case, however, I question whether, consonant with applicable Supreme Court cases, Fitzgerald can demonstrate that what occurred here amounts to a deprivation of a "liberty" interest without due process of law. Both the district court

and the majority base their conclusion to the contrary on the likelihood that the termination of the stall agreement, because of the alleged inconsistency of his horses, will "stigmatize" Fitzgerald and lead to the loss of a tangible interest, such as future employment possibilities. In this regard they rely on *Bishop v. Wood,* 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976); *Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976); and *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1971). None of these cases held, however, that the state's action created a stigma sufficient to implicate a constitutional liberty interest. Although some of the language of these opinions may be helpful to Fitzgerald, the decisions, taken as a whole, do not provide much support. Moreover, the case for such a stigma cannot be easily articulated. First, there is considerable question regarding the extent of the alleged harm to Fitzgerald's reputation. The district court reasoned:

> In the instant case . . . impairment of future business opportunities to the plaintiff as a result of the defendants' acts has been alleged, and, we conclude the likelihood thereof sufficiently proved, because under Rule 23 § 8 of the Commission Rules and Regulations, the fact of plaintiff's expulsion *must* be communicated to the Commission, which in turn *must* communicate it to every racing association in the state of Pennsylvania, which virtually assures that all of plaintiff's potential clients will be aware of it.[16]

It is not at all obvious, however, that Rule 23, § 8 applies to Mountain Laurel's action here. Fitzgerald was not excluded from the track pursuant to the racing officials' delegated power to enforce Commission rules; rather, Mountain Laurel terminated his stall privileges. In fact, apparently believing that it was not acting in a manner

---

**14.** Mountain Laurel only terminated Fitzgerald's stall agreement on seventy-two hours notice—a right given to it by that agreement. It did not seek to suspend or revoke Fitzgerald's state-issued license to race. Nor did it seek to fine him. Such courses were open, and remain open, to the racing judges and ultimately the Harness Racing Commission if they believed

that Fitzgerald, himself, had been racing inconsistently.

**15.** *Flagg Bros., Inc. v. Brooks,* 436 U.S. 149, 156, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978).

**16.** *Fitzgerald v. Mountain Laurel Racing, Inc.,* 464 F.Supp. 263, 266 (W.D.Pa.1979).

requiring it to notify the Commission under Rule 23, § 8, Mountain Laurel did not report its decision regarding Fitzgerald to the Commission, and nothing in the record indicates that it ever intended to do so.[17]

Second, it is not clear, to me at least, that Fitzgerald even alleges that his reputation will be damaged. The complaint certainly was not premised on this theory. Paragraph 20 states that the charge of inconsistency was not based on "any discrepancy or inconsistency of the plaintiff but . . . solely due to the allegation of inconsistency of the three horses."[18] Paragraph 24 adds that Mountain Laurel "has not formally charged plaintiff with any form of wrongdoing."[19] Similarly, the affidavit filed in support of the complaint asserts in paragraph 3: "It must be carefully noted that at no time has said plaintiff been accused of misconduct, specific or otherwise."[20] Thus, Fitzgerald's theory was not that a stigma would attach to him, but that the relatively few harness racing tracks in the area afforded Mountain Laurel a virtual monopoly over the sport, and that Mountain Laurel's termination of the stall agreement had the effect of depriving him of the opportunity to make a living.

Finally, Fitzgerald does not assert that the charge of driving inconsistent horses was false. It may be doubted whether statements made by a state official can be said to defame or stigmatize one's reputation so as to implicate a constitutionally protected interest when the truth of such statements is not called into question. Although Fitzgerald does not concede that he has driven inconsistent horses, neither does he allege that Mountain Laurel's actions were defamatory or untrue.

In light of these weaknesses in Fitzgerald's claim that he was deprived of a "liberty" interest, I am inclined to doubt whether Fitzgerald could prevail even if state action were established. Inasmuch as I reject the conclusion that state action is present, however, I have no occasion to address definitively the likelihood of Fitzgerald's ultimate success in this regard.

### III.

Putting aside my disagreement with the majority's resolution of the state action question and my reservations about the merits of Fitzgerald's due process claim, I also believe that the district court failed to adhere to the rules of this Court governing the issuance of preliminary injunctions.[21] First, as discussed in part II above, I believe that Fitzgerald has not demonstrated that he is reasonably likely to prevail on his claim. Second, I am not convinced that Fitzgerald has shown irreparable injury to himself or that Mountain Laurel and the public will be injured less by the injunction than Fitzgerald would be without it. There is no indication that the district court balanced Fitzgerald's interest in retaining his stall privileges against the racetrack's and the public's interests in ensuring that all races are, and appear to be, run competitively.[22] Third, the duration of the preliminary injunction extends beyond the term of the stall agreement, which expired November 11, 1978. Mountain Laurel is ordered,

---

17. Moreover, it is at least doubtful whether a stigma could be found even if such a report had been made. In *Bishop v. Wood, supra,* the charge was made that the false statements about the plaintiff would be repeated to prospective employers. Still, the Supreme Court declared that no stigma was present, in part because there was no *public* announcement of the alleged false reasons for the discharge. 426 U.S. at 348, 96 S.Ct. 2074.

18. App. 9a.

19. App. 11a.

20. App. 15a.

21. In *Delaware River Port Authority v. Transamerican Trailer Transport, Inc.,* 501 F.2d 917, 919–20 (3d Cir. 1974), the Court reiterated the longstanding rule that, before issuing a preliminary injunction, a district court must find that the plaintiff would suffer irreparable injury if the injunction is not granted, and that the plaintiff is reasonably likely to prevail on the merits. In addition, the court must balance the possibility of harm to the defendant from the grant or denial of the relief, and consider the public interest as well.

22. *See* note 8 *supra.*

pending further action by the district court, to issue a stall permit to Fitzgerald, upon the latter's request, for future racing seasons, even though Fitzgerald's rights under the stall agreement were specifically limited to the 1978 season. Therefore, the preliminary injunction extends beyond the period of time necessary to preserve the status quo ante and improperly forces Mountain Laurel to issue a permit to a person whom it otherwise has the legal right to refuse.

Because I would reverse the judgment of the district court and dissolve the preliminary injunction, I respectfully dissent.