CLAY, Circuit Judge,
concurring.
I write separately to address the question of state action. I would not so hastily set aside the question of state action in favor of exploring the constitutional violations Plaintiff alleged. The question carries import in this Circuit beyond the instant case, and the matter should at the very least be considered for three reasons. First, the district court disposed of Plaintiffs constitutional claims solely on the grounds that Defendant Jockey Club is not a state actor, and solely with reference to a previous decision of the Eastern District of Kentucky, which it considered controlling. Second, Plaintiffs arguments in his opening brief on appeal were addressed to the issue of state action, and not the viability of his constitutional claims. Third, and most importantly, the question of state action constitutes a question of threshold *671 inquiry: Section 1983 provides a vehicle for challenging the deprivation of constitutional rights “under the color of’ law, and the Constitution protects individual rights from invasion by the state. Having considered the issue, I would find that Defendant Jockey Club did not act “under color of’ law for purposes of § 1983. With respect to Defendant KHRA, however, I conclude that state action is present.
The question whether state action exists is a “necessarily fact-bound inquiry.” Lugar v. Edmondson Oil Co., Inc., 457 U.S. 922, 939, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982). “Only by sifting facts and weighing circumstances can the non-obvious involvement of the State in private conduct be attributed its true significance.” Burton v. Wilmington Parking Auth., 365 U.S. 715, 722, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961). Because this case comes before the Court on appeal from a Rule 12(b)(6) dismissal, the facts alleged by Plaintiff must be credited as true, and the complaint construed liberally. Gazette v. City of Pontiac, 41 F.3d 1061, 1064 (6th Cir. 1994). Additionally, this Court may take judicial notice of state statutes and regulations where relevant. See Val Decker Packing Co. v. Corn Prods. Sales Co., 411 F.2d 850, 852 (6th Cir.1969) (citing Lamar v. Micou, 114 U.S. 218, 223, 5 S.Ct. 857, 29 L.Ed. 94 (1885)).
We should begin by setting forth the facts relevant to the question of state action, as drawn both from a favorable reading of Plaintiffs complaint and from a review of Kentucky law. Plaintiff, the owner and operator of a thoroughbred horse farm in Kentucky, breeds and races thoroughbred horses. (J.A. at 7) Defendant Kentucky Horse Racing Authority (hereinafter “KHRA”) is an independent administrative agency of Kentucky responsible for regulating the conduct of horse racing and pari-mutuel wagering. (Id. at 7, 9; see also Ky.Rev.Stat. § 230.225(1)) KHRA consists of 13 members appointed by the Governor and one executive director. Ky.Rev.Stat. § 230.225(2). Kentucky law grants the KHRA the “full authority to prescribe necessary and reasonable administrative regulations and conditions under which horse racing at a horse race meeting shall be conducted” in Kentucky. Id. at § 230.260(3).
Defendant The Jockey Club (hereinafter “Jockey Club”) is a New York corporation licensed to do business in Kentucky, which was formed in 1894 “for the purpose of improving the breed of domestic animals.” (J.A. at 7-8) In 1896, Defendant Jockey Club became “the exclusive organization for registering and maintaining records of Thoroughbred horses in the United States,” and assumed the task of publishing the registry, The American Stud Book. (Id. at 8) Additionally, Defendant Jockey Club publishes The American Stud Book Principal Rules and Requirements (hereinafter “Stud Book Rules’’), which sets forth controlling guidelines for naming thoroughbred horses. (Id.) Jockey Club abides by those rules in reviewing requests to register or change thoroughbred horse names. (Id.) By the terms of the Rules, Defendant Jockey Club’s Registrar reserves the right to approve name requests. (Id. at 9)
Kentucky law defines “thoroughbred racing” with reference to Defendant Jockey Club. Specifically, “ ‘thoroughbred racing’ means a form of horse racing in which each horse participating in the race is a thoroughbred (i.e., meeting the requirements of and registered with The Jockey Club of New York) and is mounted by a jockey.” Ky.Rev.Stat. § 230.210(3). The regulations promulgated by KHRA require that a thoroughbred horse be “duly registered and named in the registry office of *672 the Jockey Club in New York” before that horse can be entered or raced in a Kentucky thoroughbred race. 810 Ky. Admin. Regs. 1:012, § 1. However, a limited exception permits entry into the race if “the stewards ... for good cause, in their discretion, waive” the registration requirement, finding “the horse ... otherwise correctly identified to the stewards’ satisfaction.” Id. As Plaintiff states in his complaint, neither Kentucky statute nor administrative regulations establish objective criteria for approving names for thoroughbred horses who seek to be registered with Defendant Jockey Club. Rather, by requiring thoroughbred horses to be registered with Defendant Jockey Club, KHRA effectively incorporates the Stud Book Rules as they pertain to naming thoroughbred horses. As a result, Plaintiff alleges, 8,596 Kentucky-born foals registered with Defendant Jockey Club in 2003, each at a cost of $200 payable to Defendant Jockey Club. (J.A. at 9) Mandatory registration fees for Kentucky-born foals alone thus yielded $1,719,200 in revenue to Defendant Jockey Club. (Id.) Plaintiffs complaint contains no factual allegations as to the Commonwealth of Kentucky’s revenues from thoroughbred racing.
The challenged act in the instant case is Defendant Jockey Club’s refusal to register Plaintiffs yearling filly (hereinafter “the Filly”) with Plaintiffs requested name, “Sally Hemings,” which had the alleged effect of excluding the Filly from Kentucky races. Although Defendant Jockey Club issued a Certificate of Foal Registration for the Filly and received its $200 mandatory registration fee, Defendant Jockey Club rejected Plaintiffs desired name. (J.A. at 10) Plaintiff persisted, and Defendant Jockey Club continually denied Plaintiffs requests to name the Filly “Sally Hemings.” (Id. at 11-13) Defendant Jockey Club referred Plaintiff to relevant provisions of the Stud Book Rules in support of these denials. (Id. at 11-13) Before Defendant Jockey Club’s final determination, Plaintiff could have obtained a hearing before its Board of Stewards on the matter by paying a non-refundable fee of $1,000. (Id. at 13, 28) Plaintiff elected not to seek a hearing before Defendant Jockey Club. (Id. at 29) Rather, he filed a written objection with the Stewards, to no avail. (Id. at 29-34) No mechanism exists for appeal to the Commonwealth of Kentucky, the KHRA, or the courts of the Commonwealth.[8]
Over time, the Supreme Court has employed various tests to determine whether the conduct at issue is “fairly attributable to the state,” as required by § 1983. See Wolotsky v. Huhn, 960 F.2d 1331, 1335 (6th Cir.1992). Of these, Plaintiff invokes the public function test and the close nexus test in support of his contention that Defendant Jockey Club acted under color of state law.[9] (Pl.’s Br. at 29-33) Although *673 Plaintiff does not separately argue that Defendant KHRA constitutes a state actor, Plaintiff jointly named the Jockey Club and KHRA as Defendants, and alleged constitutional violations against Defendant KHRA. Accordingly, the question of state action on the part of Defendant KHRA is also before us for consideration. Initially though, this discussion will focus on the Jockey Club.
Plaintiff first asserts that Defendant Jockey Club performed an “exclusive state function, the naming and registration of business.” (Pl.’s Br. at 30) For support, Plaintiff points to provisions in the Kentucky code that regulate the registration and naming of Kentucky corporations. See Ky.Rev.Stat. § 271B.4-010 et seq. Of course, these provisions relate to corporations, and not animals. “The public function test requires that the private entity exercise powers which are traditionally exclusively reserved to the state.” Wolotsky, 960 F.2d at 1335; see also Marsh v. Alabama, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946); Evans v. Newton, 382 U.S. 296, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966). Nothing alleged in Plaintiff’s complaint, nor found in the laws and regulations of the Commonwealth, supports Plaintiffs contention that the power to approve or reject names for thoroughbred racing horses traditionally and exclusively belonged to the Commonwealth. Plaintiffs contention under this theory lacks merit.
Second, Plaintiff attempts to show a close nexus between Defendant Jockey Club and Defendant KHRA. The “close nexus” test considers whether “a sufficiently close nexus [exists] between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself.” Jackson v. Metro. Edison Co., 419 U.S. 345, 351, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974). However detailed and extensive, state regulation and licensing of a private entity unrelated to the challenged activity does not in and of itself transform wholly private conduct into state action. Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 176-77, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972); Jackson, 419 U.S. at 350, 95 S.Ct. 449; Blum v. Yaretsky, 457 U.S. 991, 1004, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982); Sullivan, 526 U.S. at 52, 119 S.Ct. 977 (“Action taken by private entities with the mere approval or acquiescence of the State is not state action.”). Nor does substantial state funding of the activities of a private entity convert that entity’s actions into state action. Blum, 457 U.S. at 1011, 102 S.Ct. 2777. Rather, “where the impetus for the discrimination is private, the State must have ‘significantly involved itself with invidious discriminations’ in order for the discriminatory action to fall within the ambit of the constitutional prohibition.” Moose Lodge, 407 U.S. at 173, 92 S.Ct. 1965 (quoting Reitman v. Mulkey, 387 U.S. 369, 380, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967)). That is to say, the state must be “intimately involved in the challenged private conduct” for that conduct to be attributed to the state. Bier v. Fleming, 717 F.2d 308, 311 (6th Cir.1983).
Instructive cases in this Circuit and sister circuits examine the question whether private parties or entities involved in horse racing and dog racing constitute state actors for purposes of § 1983 suits. These cases militate against a finding of state action here. In this Circuit, Bier v. Flem *674 ing, 717 F.2d at 309-10, concerned a § 1983 suit brought to challenge an Ohio horse racing track’s decision to ban the plaintiff, a harness race driver, from racing in two meets at the track. The plaintiff named both the Executive Secretary of Ohio’s Racing Commission and the president of the race track as defendants. Id. at 309. Applying the nexus test, the court began by noting the private character of the race track and its president. Id. at 311. The court acknowledged that Ohio heavily regulates the horse racing industry, but found that “such extensive regulation does not, in itself, transform otherwise private actions into state action for purposes of § 1983.” Id. Nor, in the court’s view, did Ohio’s receipt of revenue from racing convert the race track’s private decision into state action. Id. The court characterized the state’s involvement as “mere approval of or acquiescence in the initiatives of a private party ... not sufficient to justify holding the State responsible.” Id. (quoting Blum, 457 U.S. at 1004-OS, 102 S.Ct. 2777) (internal quotation marks and brackets omitted). Ultimately then, the Bier court concluded that the private horse racing track did not act “under color of’ law. Id. at 310.
On two occasions, the Third Circuit has considered factually similar situations, reaching divergent outcomes each time. In Fitzgerald v. Mountain Laurel Racing, Inc., 607 F.2d 589, 591 (3d Cir.1979), a private harness racing association expelled a trainer from its track purportedly for violating a state harness racing commission rule, and the trainer brought a § 1983 suit against the association. There, the private association’s management met with the presiding racing judge and racing secretary to discuss previous consistent allegations against the trainer. Id. at 595. In the court’s view, the racing judge and racing secretary possessed state-delegated authority to discipline the trainer for violations of the Racing Commission Rules. Id. Although the private association made the decision to expel the trainer, the racing secretary informed the trainer of that decision. Id. at 596.
The Fitzgerald court applied the “close nexus” test of Jackson, framing the key issue there as “whether the State participated in the challenged conduct itself by ‘putting its weight’ behind the challenged activity.” Id. at 597. The court rejected the private association’s claim that “its act of expelling [the trainer] derived solely from its common law property rights as lessor.” Id. Rather, the court found that “whatever private rights were exerted were specifically linked to the enforcement of Racing Commission Rules.” Id. at 598. The racing officials acted pursuant to their delegated authority when they opined that the trainer had violated the rules, and the private association cited a Commission Rule violation in expelling the trainer. Id. Because the private association lacked the power to enforce Commission Rules by itself, and because the racing officials “personally and actively participated in the specific conduct challenged,” the Fitzgerald court concluded that the private association’s expulsion of the trainer was state action. Id. at 598-99. The court cautioned that where the challenged private activity occurred absent the involvement of any state official, even where the activity purportedly enforces state law, no question of a close nexus would arise. Id. at 600.
This cautionary note foreshadowed the result in Crissman v. Dover Downs Entertainment Inc., 289 F.3d 231 (3d Cir.2002) (en banc). There, the plaintiffs owned and trained horses, which they raced in Delaware. Id. at 234. The plaintiffs filed a § 1983 suit against a privately owned and operated harness racing facility where their horses had previously raced when the facility expressly excluded them from fu *675 ture participation in races at that track. Id. Because the facility is one of only two state-licensed harness racing tracks in the state, the effect of excluding plaintiffs was to bar them from entering their horses in Delaware races for one-half of the year. Id. Although the state Harness Racing Commission licensed the facility, the record did not reflect Commission involvement in the decision to exclude plaintiffs from the facility. Id. at 235. Faced with the question of state action, the Crissman court reviewed the applicable statutory and regulatory scheme, and the flow of funds between the facility and the state. Id. at 235-38.
The court rejected the plaintiffs’ argument under the “close nexus” test. The plaintiffs argued that the Commission “effectively delegated to the race track its power to determine eligibility,” and essentially “granted the track a ‘six-month monopoly.’ ” Id. at 246-47. The Crissman court reasoned that, while Jackson posited that “a heavily regulated business with at least something of a governmentally protected monopoly will more readily be found to be [a] ‘state’ act[or],” it also required that the conduct be fairly attributable to the state. Id. at 247 (quoting Jackson, 419 U.S. at 350-51, 95 S.Ct. 449) (alterations added and omitted). Although Delaware licensed and regulated the track, and received proceeds from horse racing and video lottery gaming at the track, the Crissman court found this state licensing, regulation and flow of funds insufficient to implicate Delaware in the track’s otherwise private decision to exclude the plaintiffs. Because the Commission bore no responsibility for the exclusion, the court concluded that no state action had been shown. Id.
In Fulton v. Hecht, 545 F.2d 540, 540 (5th Cir.1977), a greyhound breeder filed a § 1983 suit against a private kennel club’s owners for refusing to renew his contract to race his dogs at the club. Although privately owned, the kennel club required a state license to conduct greyhound races. Id. at 541. The breeder claimed that the kennel club was a state actor since the state heavily regulated the dog racing industry, shared dog racing revenues, and allocated racing dates among the various private tracks. Id. at 542. The Fulton court, applying Jackson, found no state action. Id. Although the court agreed that the state extensively regulated the dog racing industry, the court stated that extensive regulation alone does not “make the state a partner in the endeavors of the Kennel Club.” Id. What is more, the court observed that the state in no way partook in the decision not to renew the breeder’s contract. Id. at 543. Consequently, the kennel club held not to be a state actor for purposes of § 1983.
The Fifth Circuit in Bailey v. McCann, 550 F.2d 1016, 1017 (5th Cir.1977) concluded that the United States Trotting Association (“USTA”) did not act under color of law, as required by § 1983, when it denied a harness trainer-driver’s license to the plaintiff. The suit arose when the State of Florida denied plaintiff a state license to race allegedly because he did not possess a USTA license. Id. USTA, a private association, licenses harness racing drivers, receives no state funding, independently selects its own officers and directors, and is in no way regulated by the State of Florida. Id. at 1018. However, as a prerequisite to racing at a Florida harness racing track, all horses must be tattooed by the USTA and must possess an eligibility certificate from USTA. Id. Additionally, Florida’s harness racing regulations require drivers to be licensed both by the Florida State Racing Commission and USTA before racing in the state. Id. Further, the Florida regulations adopt USTA’s rules and regulations for any and all situations *676 not otherwise covered by the Florida rules. Id.
In pertinent part, the Bailey court analyzed the issue as follows:
... The fact that the State chooses to accord automatic weight to some of the defendant’s decisions does not alone render those decisions state action. The State may at any time choose to do otherwise and adopt and use its own standards. The fact that the State requires a USTA license in order to race is no more significant than its requirement of a law degree from an approved school as a prerequisite for taking the bar examination. Such a requirement does not change the conduct of private law schools into state action.
... State adoption of the standards of a private organization as part of a State regulatory scheme which is not administered by that organization, is no more state action by that organization than is the adoption of State regulations by a wholly private organization.
Id. at 1019. Thus, the Bailey court found the USTA was not a state actor. Id.
In the case at bar, Plaintiff vigorously argues that “Kentucky, through its statutes and regulations, has essentially delegated to The Jockey Club the authority to determine what horses can race in Kentucky.” (Pl.’s Br. at 31) Plaintiff claims that Kentucky “decided that certain qualifications are required of Thoroughbreds” and then allowed Defendant Jockey Club to define those qualifications. (Id. at 32) Plaintiffs argument fails on the facts alleged.
It cannot be gainsaid that the Commonwealth of Kentucky, by and through Defendant KHRA, extensively regulates the enterprise of thoroughbred racing. Kentucky empowers the KHRA with “full authority to prescribe necessary and reasonable administrative regulations” applicable to thoroughbred racing and pari-mutuel wagering. See Ky.Rev.Stat. § 230.260(3). With this broad authority, KHRA promulgated a rather detailed body of regulations that cover even seemingly trivial details, including registration and approval of racing colors, 810 Ky. Admin. Regs. 1:007, § 7, the time a jockey must report prior to a scheduled race, id. at 1:009, § 11, and assignment of responsibility to a horse’s trainer for maintaining clean and sanitary stable areas. Id. at 1:008, § 3. By way of example, horse owners and trainers must be licensed as a prerequisite to entering their thoroughbreds in a Kentucky race, and jockeys require a license to race. Id. at 1:007, § 1; 1:008, § 1; 1:009, § 2. The regulations impose certain duties and responsibilities for the care, health, and training of thoroughbreds on their trainers. Id. at 1:008, § 3. They require owners to disclose “the entire ownership of each horse in their care.” Id. at 1:007, § 3. They even go so far as to require that the stewards approve of any contracts entered into between apprentice jockeys and horse owners or trainers. Id. at 1:009, § 4. KHRA additionally regulates permissible wagering systems, minimum wagers and payoffs, all the details of the race itself, and much more than require mentioning here. Id. at; 1:011, §§ 1, 5; 1:015; 1:016. Further, the regulations set standards for the maintenance of private racing association grounds, including stables and start gates, lighting, stands for spectators, photo finish cameras, and so on. Id. at 1:026. All this is to say, the Commonwealth heavily regulates horse racing, down to the very last detail.
By its terms, the close nexus test laid forth in Jackson looks to the relationship between the state and “the challenged action of the regulated entity. ” Jackson, 419 U.S. at 351, 95 S.Ct. 449 (emphasis added).
*677 As the preceding discussion makes clear, the enterprise of thoroughbred racing is heavily regulated; Defendant Jockey Club is not. Were this a question of expulsion from a private racing association in the Commonwealth, as in Bier, Fitzgerald, Crissman, or Fulton, the private entity would be subject to the extensive and detailed state regulatory scheme. Yet, the Kentucky Administrative Regulations in no way guide or circumscribe the conduct of Defendant Jockey Club, and accordingly, the Jockey Club is not a “regulated entity” in any true sense of the word. It is therefore less than clear that Plaintiff can establish state action with reference to the close nexus test, which has traditionally been applied solely to “regulated” private entities. See Jackson, 419 U.S. at 351, 95 S.Ct. 449 (electric company regulated by Public Utility Commission); Blum, 457 U.S. at 994-95, 102 S.Ct. 2777 (nursing homes federally regulated with respect to Medicaid patients); Sullivan, 526 U.S. at 52, 119 S.Ct. 977 (insurance company subject to state regulation); Bier, 717 F.2d at 310 (racing facility licensed by state); Fitzgerald, 607 F.2d at 592 (same); Crissman, 289 F.3d at 234 (same). Here, Defendant Jockey Club’s approval and registration of thoroughbred names is more properly classed a private action “with the mere approval or acquiescence of the State,” insufficient to establish state action. See Sullivan, 526 U.S. at 52, 119 S.Ct. 977.
At any rate, assuming that the close nexus test does apply to private entities not subject to state regulation, “extensive regulation does not, in itself, transform otherwise private actions into state action for purposes of § 1983.” See Bier, 717 F.2d at 311. The close nexus test requires something more. Where a § 1983 litigant challenges private conduct, the state must have “intimately involved” itself in that conduct in such a way as to render it conduct “under color of’ law. See Bier, 717 F.2d at 311. The purportedly unconstitutional act here is Defendant Jockey Club’s refusal to register the Filly with the name “Sally Hemings,” which, if given effect by Defendant KHRA, results in exclusion of the Filly from thoroughbred races in the Commonwealth. Plaintiff does not allege that Defendant KHRA participated directly in the decision to deny Plaintiffs application to name the Filly “Sally Hemings.” Nor could he since Defendant KHRA plays no part in registering thoroughbred names with Defendant Jockey Club, and at no point sits in review of Defendant Jockey Club’s determinations. Furthermore, Plaintiff does not allege that Defendant Jockey Club’s officers and stewards are drawn from the ranks of the Commonwealth’s horse racing officials, or that the two entities are in anyway pervasively entwined in membership or function. Cf. Brentwood Academy v. Tenn. Secondary Sch. Athletic Ass’n, 531 U.S. 288, 298, 121 S.Ct. 924, 148 L.Ed.2d 807 (2001) (finding regulatory activity of a state-wide interscholastic athletic association akin to state action because “[t]he nominally private character of the Association is overborne by the pervasive entwinement of public institutions and public officials in its composition and workings”). On the facts alleged by Plaintiff, the KHRA did not “intimately involve” itself in the challenged act of approving thoroughbred names.
It is true that Defendant KHRA’s regulations generally require thoroughbred horses to be registered and named in the registry office of Defendant Jockey Club. 810 Ky. Admin. Regs. 1:012, § 1. Defendant Jockey Club adheres to its Stud Book Rules in approving and rejecting thoroughbred names. (J.A. at 8) Neither the Commonwealth’s regulations nor the Stud Book Rules provide for appeal to any administrative or judicial body of the Com *678 monwealth. Rather, the only mode to challenge Defendant Jockey Club’s refusal to approve a requested name is by internal appeal to the Board of Stewards of the Jockey Club. (See id. at 9, 29-34) By requiring registration with Defendant Jockey Club, KHRA effectively embraces the Stud Book Rules and, if KHRA permitted those rules to govern its behavior, they would effectively become state rules. Cf. NCAA v. Tarkanian, 488 U.S. 179, 194, 109 S.Ct. 454, 102 L.Ed.2d 469 (1988). Yet, this does not transform Defendant Jockey Club into a state actor.
The Supreme Court’s pronouncement in NCAA v. Tarkanian proves instructive on this point. There, a state university suspended the plaintiff, a basketball coach, in response to an NCAA report detailing multiple violations of NCAA rules. Tarkanian, 488 U.S. at 180-81, 109 S.Ct. 454. The court considered whether the state university’s “actions in compliance with the NCAA rules and recommendations turned the NCAA’s conduct into state action.” Id. at 193, 109 S.Ct. 454. Although the state university participated in drafting the NCAA rules, the state itself was not the source of those rules. Id. at 194, 109 S.Ct. 454. Notwithstanding the private nature of the rules, “[s]tate action ... might lie if [the state university], by embracing the NCAA’s rules, transformed them into state rules and the NCAA into a state actor.” Id. The Tarkanian court concluded that the state university “engaged in state action when it adopted the NCAA’s rules to govern its own behavior,” but the NCAA was not a state actor merely because it had formulated the disciplinary rules. Id. The court noted that the state university “retained the authority to withdraw from the NCAA and establish its own standards.” Id. at 194-95, 109 S.Ct. 454.
In the instant case, as in Tarkanian, the Commonwealth played no part in drafting the Stud Book Rules for naming thoroughbreds. However, the Commonwealth allegedly embraced Defendant Jockey Club’s Stud Book Rules for naming thoroughbreds and gave effect to those rules by denying the Filly entry into thoroughbred races for lack of a registered name. See Tarkanian, 488 U.S. at 194, 109 S.Ct. 454. KHRA’s implicit adoption of the Stud Book Rules did not transform the Jockey Club into a state actor simply by force of its role as author of the Stud Book Rules and keeper of the Registry. See id. Moreover, KHRA quite obviously retained the authority to amend its regulations to exclude reference to the Jockey Club, or to promulgate its own guidelines for the registration and naming of horses. See id. at 194-95, 109 S.Ct. 454. Thus, Plaintiff cannot show Defendant Jockey Club acted under color of law under the close nexus theory.
Finally, Plaintiff claims the Commonwealth of Kentucky “granted a state monopoly to The Jockey Club regarding the registration of Thoroughbreds and the recording of names.” (Def.’s Br. at 32) This argument is unavailing. In Jackson, the Supreme Court, in dicta, said “[i]t may well be that acts of a heavily regulated utility with at least something of a govern-mentally protected monopoly will more readily be found to be ‘state acts than will the acts of an entity lacking these characteristics.’” Jackson, 419 U.S. at 350-51, 95 S.Ct. 449. As previously discussed, Defendant Jockey Club is not a “heavily regulated utility” and, indeed, is not subject to regulation by the Commonwealth at all. What is more, Jackson went on to say that the inquiry must look to whether a close nexus exists. Id. at 351, 95 S.Ct. 449. Thus, Plaintiffs attempt to attribute state action to Defendant Jockey Club on a monopoly-status theory must also fail.
*679 Up until this point, I have solely examined the question of whether the Jockey Club acted under the color of law for purposes of § 1983. All parties to this appeal, Defendant KHRA included, focused the state action inquiry on Defendant Jockey Club, as did the district court below; indeed, Plaintiffs complaint asserted a § 1983 claim only against Defendant Jockey Club. However, inasmuch as Plaintiff alleged that Defendant KHRA violated his constitutional rights as well, I now turn my attention to Defendant KHRA. I construe Plaintiffs complaint liberally to allege that KHRA denied the Filly entry into races within the Commonwealth and, therefore, conclude that state action lies for purposes of Plaintiffs constitutional claims against KHRA.
Defendant KHRA, as an administrative agency of the Commonwealth, is a state actor. See Pennsylvania v. Bd. of Dirs. of City Trusts of Phila., 353 U.S. 230, 231, 77 S.Ct. 806, 1 L.Ed.2d 792 (1957). The regulatory scheme created by KHRA is unquestionably the product of state action. See Lugar, 457 U.S. at 941, 102 S.Ct. 2744. These regulations generally require thoroughbred horses to be registered and named with the Jockey Club prior to racing in the Commonwealth, but they also set forth a limited exception for horses who gain the approval of the racing stewards for a discretionary waiver. See 810 Ky. Admin. Regs. 1:012, § 1. As previously noted, the regulations do not establish guidelines for the Jockey Club to follow in reviewing horse names, KHRA officials do not participate in the Jockey Club’s decisions, and neither KHRA nor the Commonwealth itself sits in review of those decisions. To the extent that the challenged conduct is Defendant Jockey Club’s refusal to approve Plaintiffs requested name for the Filly, it cannot fairly be ascribed to KHRA. See Blum, 457 U.S. at 1004, 102 S.Ct. 2777 (“[A] State normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State.”).
Nevertheless, I do not doubt that state action lies when KHRA denies entry in its races to a thoroughbred horse because the Jockey Club refused to register the horse’s name. See Tarkanian, 488 U.S. at 194, 109 S.Ct. 454 (“State action nonetheless might lie if UNLV, by embracing the NCAA’s rules, transformed them into state rules.”); see also Bailey, 550 F.2d at 1019 (“Any defect in the [standards of a private organization where adopted by the State] may translate into a defect in the State system.”). As a regulatory body empowered with state authority, such direct conduct clearly constitutes state action. Reading Plaintiffs complaint liberally, as this Court must do on appeal from a motion to dismiss, Plaintiff sufficiently alleged that KHRA denied the Filly entry into thoroughbred races within the Commonwealth due and owing to Defendant Jockey Club’s refusal to approve Plaintiffs requested name. {See Pl.’s Comp, at HH 57, 58, 79, 85) Plaintiffs complaint therefore alleged sufficient facts to show that KHRA embraced the Jockey Club’s rules in such a way to “transform[] them into state rules,” satisfying the state action requirement with respect to Defendant KHRA. See Tarkanian, 488 U.S. at 194, 109 S.Ct. 454.
Consequently, on the facts alleged, as read in concert with the statutes and regulations of the Commonwealth of Kentucky, I conclude that Plaintiff failed to show that Defendant Jockey Club acted under color of law. The district court therefore correctly dismissed Plaintiffs federal constitutional challenges against Defendant Jockey Club for lack of state action. With *680 respect to Defendant KHRA, I would find state action. Nevertheless, because Plaintiffs complaint failed to state a claim that Defendant KHRA violated his constitutional rights, I join in the judgment. I find it unnecessary to join in the majority’s discussion of Plaintiffs several federal constitutional challenges, and thus refrain from doing so.

. Plaintiff’s complaint does not allege that Plaintiff sought a discretionary waiver from Defendant KHRA’s stewards to race the Filly without a name. See 810 Ky. Admin. Regs. 1:012, § 1.

. It is somewhat less than clear from Plaintiff's brief whether he intended to invoke the close nexus test, or the symbiotic relationship test established in Burton v. Wilmington Parking Auth., 365 U.S. 715, 81 S.Ct. 856 (1961). In Burton, the privately owned restaurant responsible for the challenged discriminatory conduct leased public property, and existed in a state of mutually beneficial interdependence with the city. Id. at 723-76, 81 S.Ct. 856. Burton itself took pains to confine its holding to the facts then before it, id. at 725-26, 81 S.Ct. 856 and subsequent courts have followed suit. See, e.g., Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 175, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972) (“Here there is nothing approaching the symbiotic relationship between lessor and lessee.”); Crissman v. Dover Downs Entm’t Inc., 289 F.3d 231, 242 (3d Cir.2002) (en banc). At any rate, the Su *673 preme Court has acknowledged that Jackson v. Metro. Edison Co. modified "the vague 'joint participation’ test” of Burton. Am. Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 57, 119 S.Ct. 977, 143 L.Ed.2d 130 (1999). Thus, for purposes of this concurrence, I examine Plaintiff's claim under the close nexus test, and not the symbiotic relationship analysis.